ACCEPTED
03-14-00700-CR
3616948
THIRD COURT OF APPEALS
AUSTIN, TEXAS
12/30/2014 2:06:19 PM
JEFFREY D. KYLE
CLERK

## No. 03-14-00700-CR

## IN THE TEXAS COURT OF APPEALS
## THIRD DISTRICT
## AT AUSTIN

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
12/30/2014 2:06:19 PM
JEFFREY D. KYLE
Clerk

_____

## ALEXANDRIA TAMMY HAMPTON, Appellant

*v.*

## THE STATE OF TEXAS

_____

## DIRECT APPEAL FROM THE
## 426TH DISTRICT COURT OF BELL COUNTY
## TRIAL COURT CAUSE NUMBER 72,513

_____

## BRIEF FOR APPELLANT

_____

**Richard E. Wetzel**
**State Bar No. 21236300**

**1411 West Avenue, Suite 100**
**Austin, Texas 78701**

**(512) 469-7943**
**(512) 474-5594 – facsimile**
**wetzel_law@1411west.com**

**Attorney for Appellant**
**Alexandria Tammy Hampton**

## Identity of Parties and Counsel

| | |
|---|---|
| Appellant: | Alexandria Tammy Hampton |
| Appellate Counsel: | Richard E. Wetzel<br>Attorney at Law<br>1411 West Ave., Ste. 100<br>Austin, TX 78701 |
| Trial Counsel: | Sam Martinez<br>Attorney at Law<br>1105 Wooded Acres Drive<br>Waco, TX<br>76710 |
| Appellee: | The State of Texas |
| Appellate Counsel<br>And Trial Counsel: | Henry Garza<br>District Attorney<br>Post Office Box 540<br>Belton, TX 76513 |
| Trial Judge: | Hon. Fancy H. Jezek<br>426th District Court<br>Bell County, Texas |

# Table of Contents

**Page**

List of Parties . . . . . . . . . . . . . . . . . . .ii

Table of Contents . . . . . . . . . . . . . . . . . . iii

Index of Authorities . . . . . . . . . . . . . . . . . . iv

Statement of the Case . . . . . . . . . . . . . . . . . . 1

Issues Presented . . . . . . . . . . . . . . . . . 2

Statement of Facts . . . . . . . . . . . . . . . . . .3

Summary of the Argument . . . . . . . . . . . . . . . . 16

Points of Error One through Eight . . . . . . . . . . . . . . . . . . .19

The trial court abused its discretion by overruling Hampton's TEX. R. EVID. 404 objections to the admission of extraneous offenses and bad acts (8 RR 68, 8 RR 110, and 9 RR 131).

Points of Error Nine through Fifteen . . . . . . . . . . . . . . . . . . .28

The trial court abused its discretion by overruling Hampton's TEX. R. EVID. 403 objections to the admission of extraneous offenses and bad acts (8 RR 110 and 9 RR 131).

Prayer . . . . . . . . . . . . . . . . . 35

Certificate of Compliance . . . . . . . . . . . . . . . . . . 36

Certificate of Service . . . . . . . . . . . . . . . . . . 36

**Index of Authorities**

**Page**

**Cases**

*Abdnor v. State*, 871 S.W.2d 726
(Tex. Crim. App. 1994) . . . . . . . . . . . . . . . 21, 27

*Alba v. State*, 905 S.W.2d 581
(Tex. Crim. App. 1995) . . . . . . . . . . . . . . . . . 22

*Arnold v. State*, 234 S.W.3d 664
(Tex. App. – Houston [14th Dist.] 2007, no pet.) . . . . . . . . . . . . . . . . . 23

*Crane v. State,* 786 S.W.2d 338
(Tex. Crim. App. 1990) . . . . . . . . . . . . . . . . . 23

*Darkins v. State*, 430 S.W.3d 559
(Tex. App.—Houston [14th Dist.] 2014, pet. ref'd) . . . . . . . . . . . . . . . . . 23

*Gomez v. State,* 626 S.W.2d 113
(Tex. App.—Corpus Christi 1981, pet. ref'd) . . . . . . . . . . . . . . . . . 24

*Halliburton,* 528 S.W.2d 216
(Tex. Crim. App. 1975) . . . . . . . . . . . . . . . . . 24

*Johnson v. State*, 43 S.W.3d 1
(Tex. Crim. App. 2001) . . . . . . . . . . . . . . . . . 26

*Johnson v. State*, 967 S.W.2d 410
(Tex. Crim. App. 1998) . . . . . . . . . . . . . . . . . 25

*Johnston v. State*, 145 S.W.3d 215
(Tex. Crim. App. 2004) . . . . . . . . . . . . . . . 21, 23

*King v. State*, 953 S.W.2d 266
(Tex. Crim. App. 1997) . . . . . . . . . . . . . . . . . 25

*Kotteakos v. United States*, 328 U.S. 750
(1946) . . . . . . . . . . . . . . . 25, 26

*Lockhart v. State*, 847 S.W.2d 568
(Tex. Crim. App. 1992*)* . . . . . . . . . . . . . . . . . . 21

*Lopez v. State,* 200 S.W.3d 246
(Tex.App.-Houston [14th Dist.] 2006, pet. ref'd.) . . . . . . . . . . . . . . . . . . 23

*McGregor v. State*, 394 S.W.3d 90
(Tex. App. – Houston [1ˢᵗ Dist.] 2012, pet. ref'd) . . . . . . . . . . . . . . . . . 33

*Mann v. State,* 718 S.W.2d 741
(Tex. Crim. App. 1986) . . . . . . . . . . . . . . . . . . 22

*Montgomery v. State*, 810 S.W.2d 372
(Tex. Crim. App. 1991) . . . . . . . . . . . . . . . 23, 30

*Moses v. State*, 105 S.W.3d 622
(Tex. Crim. App. 2003) . . . . . . . . . . . . . . . . . . 21

*Motilla v. State*, 78 S.W.3d 352
(Tex. Crim. App. 2002) . . . . . . . . . . . . . . . 26, 27

*Mozon v. State*, 991 S.W.2d 841
(Tex. Crim. App. 1999) . . . . . . . . . . . . . . . . . . 22

*Newton v. State*, 301 S.W.3d 315
(Tex. App.—Waco 2009, pet. ref'd) . . . . . . . . . . . . . . . . . . 33

*Rankin v. State*, 953 S.W.2d 740
(Tex. Crim. App. 1996) . . . . . . . . . . . . . . . . . . 21

*Russell v. State*, 113 S.W.3d 530
(Tex. App.—Fort Worth 2003, pet. ref'd) . . . . . . . . . . . . . . . . . . 33

*Webb v. State*, 36 S.W.3d 164
(Tex. App.-Houston [14ᵗʰ Dist.] 2000, pet. ref'd) . . . . . . . . . . . . . . . . . . 25

**Statutes**

TEX. PEN. CODE § 22.02(a) . . . . . . . . . . . . . . . . . . .1

TEX. PEN. CODE § 22.02(b)(1) . . . . . . . . . . . . . . . . . . . .1

**Rules**

TEX. R. APP. P. 9.4 . . . . . . . . . . . . . . . . . . 36

TEX. R. APP. P. 44.2(b) . . . . . . . . . . . . . . 28, 35

TEX. R. EVID. 403 . . . . . . . . . . . . . . *passim*

TEX. R. EVID. 404 . . . . . . . . . . . . . . *passim*

## Statement of the Case

This is an appeal from a criminal proceeding. Alexandria Tammy Hampton was indicted by a Bell County grand jury for the offense of aggravated assault (CR 5). The indictment alleges that on May 4, 2013, while in a dating relationship with Antonio Jennings, Hampton caused serious bodily injury to Jennings by stabbing him with a deadly weapon, namely a knife (CR 5). *See* TEX. PEN. CODE §§ 22.02(a) and 22.02(b)(1).

A jury was selected and sworn (5 RR 4). Hampton entered a plea of not guilty to the indicted offense of aggravated assault (5 RR 15). The jury found her guilty of aggravated assault as alleged in the indictment (CR 62, 12 RR 46).

Hampton elected for the jury to assess punishment (CR 17). At the conclusion of the punishment phase, the jury assessed punishment at 60 years (15 RR 39). Hampton was sentenced in open court (15 RR 42).

The trial court certified Hampton's right to appeal (CR 77). Notice of appeal was timely filed (CR 67).

## Issues Presented on Appeal

**Points of Error One through Eight**

**The trial court abused its discretion by overruling Hampton's TEX. R. EVID. 404 objections to the admission of extraneous offenses and bad acts (8 RR 68, 8 RR 110, and 9 RR 131).**

**Points of Error Nine through Fifteen**

**The trial court abused its discretion by overruling Hampton's TEX. R. EVID. 403 objections to the admission of extraneous offenses and bad acts (8 RR 110 and 9 RR 131).**

**Statement of Facts**

**A. The Primary Offense Evidence**

The indictment alleges that on May 4, 2013, while in a dating relationship with Antonio Jennings, Hampton caused serious bodily injury to Jennings by stabbing him with a deadly weapon, namely a knife (CR 5).

On May 4, 2013, Kellye McDermott, of the Killeen Police Department, responded to a stabbing report (8 RR 7-9). She found Jennings on the ground outside an apartment and he told her that Hampton had stabbed him (8 RR 11, 14).

Hampton lived in the same apartment complex at which Jennings was found (8 RR 15). McDermott went to Hampton's door and knocked (8 RR 15). When Hampton answered the door, she had blood on her clothing and hands (8 RR 16). Inside Hampton's apartment, McDermott noticed blood on the floor and overturned furniture (8 RR 17). Hampton showed her the knife she had used to stab Jennings (8 RR 18). Hampton told McDermott that Jennings had broken several items in the apartment and turned over furniture before she stabbed him (8 RR 22).

Hampton related the stabbing took place in the bedroom when Jennings tried to force himself on her (8 RR 21). McDermott noticed swelling on Hampton's face (8 RR 42).

Alvin Rhoden, of the Killeen Police Department, responded to the scene at the same time as McDermott (8 RR 45). He saw Jennings on the ground (8 RR 45). Jennings was bleeding profusely and declaring he was near death (8 RR 46).

Rhoden and McDermott followed a blood trail to the apartment Jennings said he occupied with Hampton (8 RR 49). Hampton answered to door with blood on her face and hands (8 RR 49).

Inside the apartment, Rhoden observed blood on the floor and walls as well as furniture Hampton claimed Jennings had overturned (8 RR 50). Hampton showed the officer the knife used to stab Jennings (8 RR 51). Hampton related she stabbed Jennings because he was trying to put his hands on her (8 RR 54).

The complainant, Antonio Jennings previously dated Hampton (8 RR 61). She was absent from the home for two months while in Virginia and Jennings cared for her child and her niece (8 RR 68). While she was gone, Jennings began to see another woman (8 RR 70). Hampton hit him in the face when she learned he was dating someone other than her (8 RR 71). Jennings related another instance in which he drove Hampton home after a party and she struck him in the face (8 RR

4

75). On another occasion, Hampton pushed him into a wall when he was attempting to take his car keys from her (8 RR 83).

On May 4, 2014, Hampton called Jennings and invited him to come over to her apartment and play cards with another couple (8 RR 90). After the card game, Hampton became upset when Jennings told her that he was going to see his daughter and his daughter's mother the following day (8 RR 93).

They entered the bedroom and kissed (8 RR 95). Jennings had oral sex with Hampton (8 RR 95). Hampton refused to allow him to penetrate her vagina with his penis (8 RR 96). Jennings was upset with her refusal and during a second attempt at penetration; she stabbed him several times (8 RR 96, 99). In response to the stabbing, Jennings exclaimed "Bitch, did you just stab me?" (8 RR 99).

Jennings gathered his belongings and went to the apartment of his sister, Cheleste Jennings, in the same complex (8 RR 84, 102). He told his sister he had been stabbed and that EMS should be summoned (8 RR 102).

Jennings denied striking Hampton during the stabbing incident or leaving her apartment in disarray (8 RR 100, 9 RR 14). Jennings was in the hospital for 14 days due to the injuries he sustained during the stabbing (8 RR 104). He sustained stab wounds to his hand, arm, chest, and back (8 RR 104).

Hampton tried to call him on the telephone while he was in the hospital (9 RR 7). He rebuffed her attempts to see him once he was released from the hospital (9 RR 9).

Cheleste Jennings is the sister of Jennings (9 RR 52). She lives in the same apartment complex as Hampton and met Hampton when she started dating her brother (9 RR 53). In the early morning hours of May 4, 2013, Hampton came to Cheleste's apartment and started beating on the door (9 RR 56). Hampton told Cheleste that she was tired of arguing with Jennings and he was breaking things in her apartment (9 RR 57). While talking to Hampton, Cheleste saw Jennings staggering in the yard while proclaiming he had been stabbed (9 RR 58). Cheleste called 911 and attempted to comfort her badly bleeding brother until help arrived (9 RR 59). After Cheleste called 911, Hampton went back to her apartment (9 RR 60). While speaking with Cheleste, Hampton did not indicate Jennings had hit her or attempted to sexually assault her (9 RR 61).

Dantrel Felton is the boyfriend of Cheleste Jennings (9 RR 88). He was at her apartment the night Jennings was stabbed (9 RR 90). When Cheleste opened the door to Hampton's knocking, Felton saw Jennings outside covered in blood and exclaiming he had been stabbed (9 RR 92). Felton cared for Jennings until medical aide arrived (9 RR 93).

6

Crystal Whiteside is the mother of Jennings' children (9 RR 106). After Jennings was released from the hospital, he would stay with her or his mother (9 RR 110).

Jerry Jennings knows Hampton because she previously dated his brother (9 RR 134). After the stabbing, Hampton told him that she stabbed his brother because she felt betrayed by his relationship with his baby's mama (9 RR 137).

Angela Gomez and Hampton were friends until June of 2013 (10 RR 62). Gomez and her boyfriend, Alan Butler, would socialize with Hampton and Jennings (10 RR 64).

Debra Kleypas, a nurse, examined Jennings while he was in the hospital (9 RR 29). He had stab wounds to his back, side, arm, and fingers (9 RR 41, 43). Additionally, the stabbing had resulted in a collapsed lung as well as a laceration of a kidney (9 RR 42). The injuries suffered by Jennings were serious bodily injuries and could have caused death without medical intervention (9 RR 46).

Dr. Randall Smith treated Jennings at the hospital (9 RR 77). He suffered multiple stab wounds resulting in a laceration of a kidney and a collapsed lung (9 RR 79, 81). His injuries were serious bodily injuries capable of causing death (9 RR 83). The knife used in the incident was capable of causing death or serious bodily injury (9 RR 86).

Sharon Brank, of the Killeen Police Department, responded to the scene of Jennings' stabbing (9 RR 146). She took photographs and collected evidence (9 RR 148). Brank was able to determine the stabbing occurred in the bedroom and the blood source then proceeded out the front door of the apartment (9 RR 151). Brank believed the crime scene at Hampton's apartment was staged because none of the overturned furniture had blood on it (9 RR 153). Rather, all of the blood was under the overturned furniture (9 RR 153, 10 RR 16).

An examination of the cell phone in Hampton's kitchen did not reveal a 911 call after the stabbing (10 RR 13). Hampton refused Brank's repeated requests to provide a written statement concerning Jennings' attempted sexual assault before the stabbing (10 RR 20).

Nathan McCown, of the Killeen Police Department, spoke with Hampton on the same day of the stabbing (10 RR 41). Hampton came to the police station and reported she was being followed by friends of Jennings (10 RR 41). McCown never found a vehicle matching the description provided by Hampton (10 RR 42).

Hampton refused a request to provide a written statement about any sexual assault which occurred earlier in the day before she stabbed Jennings (10 RR 43). She left the police station when McCown requested information concerning the alleged sexual assault which precipitated the stabbing (10 RR 47).

8

Christopher Ache, of the Killeen Police Department, previously responded to a domestic disturbance call at Hampton's apartment on March 31, 2013 (10 RR 55). He observed Jennings with swelling on his face (10 RR 56). After speaking with Hampton, Ache arrested her for domestic violence against Jennings (10 RR 57).

## B. The Evidence of Extraneous Offenses

Over timely and specific objections at trial, the jury was provided with an abundance of extraneous offenses evidence at trial. The record reflects the following instances of bad conduct by Hampton admitted by the trial court during the State's case in chief.

Jennings was permitted to testify that the reason he cared for Hampton's son and niece for two months was because she was in trouble with her probation officer in Virginia and locked up (8 RR 68, 9 RR 26). He testified Hampton was implicated in the burglary of his sister's apartment after his stabbing (9 RR 9). He indicated Hampton was responsible for vandalizing Crystal Whiteside's car after his release from the hospital by putting sugar in the gas tank and slashing her tires (9 RR 10). Hampton was responsible for slashing the tires of his brother's car after the stabbing (9 RR 12). Finally, he related an incident in which Hampton had attempted to burglarize an automobile occupied by Crystal Whiteside (9 RR 13).

9

Cheleste Jennings testified that after the stabbing, her apartment was burglarized and various electronic items were taken (9 RR 63). Additionally, during the burglary, her jewelry had been disturbed (9 RR 65).

Cheleste was allowed to testify that before the stabbing, Hampton told her that she did not like Crystal Whiteside and that if she was back home in Virginia, she could pay someone a bag of weed to do something bad to her (9 RR 66). In another incident, Hampton told Cheleste that she was prepared to beat Crystal's ass and the only reason she didn't was because she had a cast on her foot (9 RR 66).

Dantrel Felton testified that the apartment he shared with Cheleste was burglarized while Jennings was in the hospital (9 RR 96). A television and jewelry was taken (9 RR 96). Their daughter's room was destroyed (9 RR 96).

Crystal Whiteside testified that Jennings stayed with her after he was released from the hospital (9 RR 106). During that period of time, someone vandalized her car by putting sugar in the gas tank and slashing the tires (9 RR 110). Hampton repeatedly drove by her home after Jennings was released from the hospital (9 RR 112). She overheard Hampton offer to reimburse Jerry Jennings for the damage she had done to his car by slashing the tires (9 RR 114). Whiteside related an incident in which Hampton aggressively attempted to enter her car while it was occupied by Whiteside (9 RR 116).

10

Jerry Jennings testified that Hampton admitted slashing the tires on his car (9 RR 138). He had seen Hampton be aggressive toward Crystal Whiteside and attempt to enter her occupied car (9 RR 138-139).

Officer Sharon Brank, of the Killeen Police Department, related various extraneous offenses in which Hampton was implicated (10 RR 25). Specifically, she referred to the burglary of Cheleste's home, criminal mischief involving Crystal Whiteside's car, and harassment of Whiteside by Hampton (10 RR 25).

Angela Gomez testified that Hampton told her she had put sugar in the gas tank of Whiteside's car and slashed her tires (10 RR 65). She was with Hampton as they drove by Whiteside's house after the stabbing (10 RR 66). Hampton admitted to her that she burglarized Cheleste's home (10 RR 67). The State rested (10 RR 69).

### C. The Defense Evidence

Gillian Sheppard is a SANE nurse at Scott and White Hospital (10 RR 71). She examined Hampton on May 4, 2013 (10 RR 73). During the examination, Hampton told her that her last consensual sexual encounter was on April 30, 2013 (10 RR 79). Hampton further indicated that on May 4, 2013, Jennings had sexually assaulted her and hit her before she stabbed him (10 RR 81, 87). Hampton said Jennings penetrated her vagina with his penis, but did not ejaculate

11

(10 RR 81). Sheppard took various swab samples during the examination (10 RR 92). Sheppard's report was admitted into evidence (10 RR 75, 16 RR DEX 2).

Josef Lopez is a forensic scientist with the Department of Public Safety (10 RR 113). He examined the samples taken by Sheppard during her examination of Hampton (10 RR 116). The vaginal swabs revealed the presence of probable semen but no spermatozoa (10 RR 121). He found sperm in perianal swabs (10 RR 123). His findings were consistent with Hampton's story of consensual sex on April 30 and sex with no ejaculation on May 4 (10 RR 126).

Tanisha Green is Hampton's longtime friend (10 RR 128). Green had previously seen both verbal and physical domestic violence between Hampton and Jennings (10 RR 133).

Abrilyanna Dailey is Hampton's niece (11 RR 4). She previously lived with Hampton when Jennings was staying in the home (11 RR 7). She related an incident in which she tried to call the police when Jennings hit Hampton in the face (11 RR 7). She was unable to do so because Jennings ripped the phone from the wall (11 RR 7). When the police did arrive, Hampton, rather than Jennings was arrested (11 RR 9).

The defense rested and both sides closed (11 RR 13, 15). No objection was voiced to the jury charge by Hampton (11 RR 15, 12 RR 4). The charge was read

12

to the jury (12 RR 6).  The charge included instructions on the justifications of self-defense and deadly force in defense of person.  *See* TEX. PEN. CODE §§ 9.31 and 9.32 (CR 53-55).

Argument was presented in which the State claimed a finding of self-defense by the jury was not justified (12 RR 21-22 and 42-45).  Counsel for Hampton relied extensively on the law of self-defense in seeking a finding of not guilty (12 RR 25-29, 35).  The jury found Hampton guilty as charged in the indictment (12 RR 46).

### D.  The Punishment Evidence

Hampton elected for the jury to assess punishment (CR 17).  At the commencement of the punishment proceeding, Hampton stipulated to five prior convictions (13 RR 6, 16 RR SEX 71).

Derek Elam is a disciplinary officer for the Bell County Jail (13 RR 8).  During Hampton's period of pretrial incarceration, she violated various rules and policies of the jail including excessive noise, fighting, assault, and false identification (13 RR 11-14).

Jerry Jennings testified that on June 8, 2013, a number of people were at his home including his mother (13 RR 24).  Hampton arrived at his home driving a car

with a second car following her (13 RR 26). Hampton exited her car as did the three occupants of the second car (13 RR 27). They were speaking aggressively like they wanted to fight (13 RR 27). One of the occupants of the second car fired a pistol at Jerry and ran toward his house (13 RR 29). The shooter kicked in the door and fired shots in the house (13 RR 31-32). When the shooter left, Jerry discovered his mother had been shot in his home (13 RR 32). His mother died from her gunshot wound (13 RR 33). Jerry never saw Hampton with a gun during the shooting incident (13 RR 35). The shooter was later identified as Harry Parsons (13 RR 36).

Cheleste Jennings was with her mother, Veronica Avant, at Jerry's house on the day of the shooting (13 RR 39). She saw Hampton arrive at Jerry's house in a car followed by a second car (13 RR 42-43). All of the occupants left the two cars and Cheleste then heard gunshots (13 RR 46). After the shooting stopped and the two cars left, she discovered her mother had been shot in Jerry's house (13 RR 46). Her mother died from her gunshot wound (13 RR 46). Cheleste never saw Hampton with a gun at the shooting or encouraging the shooter (13 RR 49).

The complainant, Antonio Jennings was at Jerry's house when his mother was shot (13 RR 51). The shooter was Harry Parsons, a former boyfriend of Hampton's from Virginia (13 RR 54). Hampton encouraged Parsons during the

14

shooting by repeatedly screaming "yeah" (13 RR 55). Parsons fired two or three shots at Jerry before Jerry and his mother ran into Jerry's house (13 RR 56). After Parsons followed them into the house, Jennings heard two or three more shots (13 RR 57). He later discovered his mother had been shot in the house and died (13 RR 59).

Angela Gomez was the driver of the second car which followed Hampton to Jerry's house (13 RR 76). Her car was also occupied by Harry Parsons and Alan Butler (13 RR 76). They arrived at the house; Parsons jumped out of the car, and started shooting (13 RR 78). When the shooting ended, Parsons left in a car with Hampton (13 RR 79). The following day, Hampton borrowed Gomez's car and left with Parsons (13 RR 84). Gomez called the police two days later to report her knowledge of the incident (14 RR 6).

Fred Harris, of the Killeen Police Department, responded to the Avant shooting (14 RR 12). He found four spent shell casings at the scene which had been fired by the same gun (14 RR 14). It was later determined Harry Parsons was the shooter (14 RR 14). Before the shooting, Parsons had come to Texas from Virginia with money wired to him by Hampton (14 RR 17). Parsons was arrested in Round Rock on the day after the shooting (14 RR 18). The State rested on punishment (14 RR 23).

Hampton testified she stabbed Jennings while trying to protect herself from him (14 RR 24).  They had a volatile relationship (14 RR 36).  She admitted sending Parsons money in Virginia to come visit her in Texas (14 RR 38).  She did not give Parsons a gun and did not know he had a gun at the time they went to Jerry's house (14 RR 40).

She went to Jerry's house intending to fight Crystal Whiteside after Whiteside had threatened her with a baseball bat (14 RR 45).  After arriving, Hampton heard gunshots and saw Parsons at Jerry's front door with a gun (14 RR 47).  Hampton learned the following day that Avant had died in the shooting (14 RR 48).  She was too scared to call the police (14 RR 48).  The gun possessed by Parsons belonged to Butler and she does not know what happened to it after the shooting (14 RR 60).

The defense rested and both sides closed on punishment (14 RR 119).  No objection was voiced to the jury charge by Hampton (14 RR 121).  The charge was read to the jury (15 RR 7).  Argument was presented (15 RR 11, 14, and 28).  The jury returned a punishment verdict of 60 years in prison and no fine (CR 63, 15 RR 39).  Hampton was sentenced in open court (15 RR 42).

## Summary of the Argument

The first eight points of error are directed at the trial court's denial of Hampton's TEX. R. EVID. 404 objections to the admission of extraneous offenses, prior bad acts, and a prior criminal record. The State argued the evidence was admissible to prove motive, intent, and in rebuttal of Hampton's claim of self-defense. Hampton maintains the evidence of other crimes, wrongs, and acts of which she now complains was erroneously admitted contrary to TEX. R. EVID. 404(b) as character conformity evidence.

The extraneous offenses, bad acts, and prior criminal record had no relevance to the aggravated assault charge pending against Hampton. Intent was inferred from the use of a deadly weapon, motive was not an element, and the complained of evidence did not rebut the assertion of self-defense.

After reviewing the entire record, this Court will be unable to find with fair assurance that the erroneous admission of other crimes, wrongs, and acts did not have a substantial and injurious effect or influence on the jury's verdict. In fact, considering the large volume of detailed inflammatory evidence presented to the jury about the extraneous criminal activities of Hampton the record reflects a likelihood that the extraneous matters did have a substantial influence on the jury's verdict.

Points of error nine through fifteen are directed at the trial court's denial of Hampton's TEX. R. EVID. 403 objections to the admission of extraneous offense and bad acts by Hampton. Because Hampton claimed prejudice from the admission of "other crime, wrong, or act" evidence, the trial court was called upon to weigh the probative value of such evidence against its potential for unfair prejudice, that is, its tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.

Hampton stood indicted for the aggravated assault of Jennings but, during her trial there was a horde of "other crime, wrong, or act" evidence admitted by the trial court. Needless to say, this horde of "other crime, wrong, or act" evidence represented such a great portion of the State's evidence that the resulting prejudicial impact was of such a magnitude that it defied any decent standard of fairness.

Consequently, Hampton maintains she did not receive a fair and impartial trial because the jury was inundated with so much "other crime, wrong, or act" evidence that the jury was unconsciously, unwittingly, and unfairly prejudiced against her. Hampton submits the trial court abused its discretion in conducting the Rule 403 balancing test and failing to exclude the evidence of other crimes,

18

wrongs, and acts on the basis the probative value of the evidence was substantially outweighed by the danger of unfair prejudice.

After reviewing the entire record, this Court will be unable to find with fair assurance that the erroneous admission of other crimes, wrongs, and acts did not have a substantial and injurious effect or influence on the jury's verdict. In fact, considering the large volume of detailed inflammatory evidence presented to the jury about the extraneous criminal activities of Hampton the record reflects a likelihood that the extraneous matters did have a substantial influence on the jury's verdict.

### Points of Error One through Eight

**The trial court abused its discretion by overruling Hampton's TEX. R. EVID. 404 objections to the admission of extraneous offenses and bad acts (8 RR 68, 8 RR 110, and 9 RR 131).**

These points of error concern the same subject matter and the repeated abuse of discretion by the trial court. The points are directed at the trial court's denial of Hampton's TEX. R. EVID. 404 objections to the admission of extraneous offenses and bad acts. The evidence concerning those extraneous offenses and bad acts is set out above in the statement of facts.

Specifically: Hampton complaints of the admission of her Virginia prior conviction at 8 RR 68 and 9 RR 26 in point of error one; the admission of the burglary of Cheleste's apartment at 9 RR 9, 9 RR 63, 9 RR 96, 10 RR 25, and 10 RR 67 in point of error two; the admission of vandalizing Crystal's car at 9 RR 10, 9 RR 110, 10 RR 25, and 10 RR 65 in point of error three; the admission of vandalizing Jerry's car at 9 RR 12, 9 RR 114, 9 RR 131, and 9 RR 138 in point of error four; the admission of the attempted burglary of Crystal's car at 9 RR 13, 9 RR 116, and 9 RR 139 in point of error five; the admission of the threat to hire someone to get Crystal before the stabbing at 9 RR 66 in point of error six; the admission of a threat to beat Crystal before the stabbing at 9 RR 66 in point of error number seven; and the admission of stalking Crystal at 9 RR 112 and 10 RR 66 in point of error number eight.

Hearings were held outside the presence of the jury on the admissibility of the complained of evidence (6 RR 5 – 90, 7 RR 4 – 57, and 9 RR 119 – 131). The State claimed the complained of evidence was admissible rebut Hampton's claim of self-defense, show motive, and show intent (7 RR 55, 8 RR 109). Hampton maintained the evidence the State sought to offer was inadmissible under TEX. R. EVID. 404. The trial court overruled the objections and granted Hampton a running objection (8 RR 68, 8 RR 113, and 9 RR 131).

20

An extraneous offense is any act of misconduct, whether resulting in prosecution or not, that is not shown in the charging papers and shown to have been committed by the accused. *Rankin v. State*, 953 S.W.2d 740, 741 (Tex. Crim. App. 1996). A trial court should be diligent and forever mindful of the devastating impact of extraneous offense evidence on the jury's rational disposition towards other evidence because of the jury's natural inclination to infer guilt to the charged offense from the extraneous offenses. *Abdnor v. State*, 871 S.W.2d 726, 738 (Tex. Crim. App. 1994). In fact, to ensure that a defendant is tried only for the crime with which he is charged and not for criminal propensity, evidence of extraneous offenses is normally inadmissible. *Moses v. State*, 105 S.W.3d 622, 626 (Tex. Crim. App. 2003).

The general rule of law is that evidence of extraneous offenses or prior wrongful acts is inadmissible as evidence of a person's character—and rightly so—because of the inherent prejudice that such evidence could unsuspectingly have on jurors. *Johnston v. State*, 145 S.W.3d 215, 219 (Tex. Crim. App. 2004). Generally, an accused may only be tried for the offense with which he is charged and not for being a criminal generally. *Lockhart v. State*, 847 S.W.2d 568, 570 (Tex. Crim. App. 1992*)*. TEX. R. EVID. 404(b) seeks to protect the defendant from the inherent dangers presented by the admission of extraneous offenses.

21

A trial court has broad discretion in determining the admissibility of evidence, and its decision will not be disturbed absent a showing that discretion was abused. *Mozon v. State*, 991 S.W.2d 841 (Tex. Crim. App. 1999). Extraneous-offense evidence is admissible if that evidence satisfies a two-pronged test: (1) whether the extraneous-offense evidence is relevant to a fact of consequence in the case aside from its tendency to show action in conformity with character; and (2) whether the probative value of the evidence is not substantially outweighed by unfair prejudice. *Mann v. State,* 718 S.W.2d 741, 743 (Tex. Crim. App. 1986). To be admissible, extraneous offense evidence must be relevant apart from its proof of character conformity. *Alba v. State*, 905 S.W.2d 581, 585 (Tex. Crim. App. 1995).

Hampton maintains the evidence of other crimes, wrongs, and acts of which she now complains was erroneously admitted contrary to TEX. R. EVID. 404(b) as character conformity evidence. The extraneous offenses, prior criminal record, and bad acts had no relevance to the aggravated assault charge pending against Hampton.

The extraneous conduct was not necessary to prove intent in the instant prosecution. Hampton's prior criminal record from the State of Virginia had no logical relevance to the stabbing of Jennings. Her prior threats to Crystal did were

22

not shown to have relevance to her stabbing Jennings. Finally, the extraneous offenses after the stabbing were irrelevant to the stabbing and thus inadmissible under TEX. R. EVID. 404. Hampton's intent to cause serious bodily injury could be inferred from the use of a deadly weapon, a knife. See *Arnold v. State,* 234 S.W.3d 664, 672 (Tex. App.-Houston [14th Dist.] 2007, no pet.); *Darkins v. State*, 430 S.W.3d 559, 565 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd). The State was erroneously permitted to portray Hampton as a violent criminal with a prior criminal record and a criminal in general.

Likewise, the complained of evidence was inadmissible to prove motive to stab Jennings. Hampton claimed the stabbing occurred during a sexual assault. Jennings maintained he was engaged in a consensual encounter when the stabbing occurred. Though motive is not an element of aggravated assault with a deadly weapon, the prosecution may offer evidence to show motive for the commission of the offense because it is relevant as a circumstance to prove the commission of the offense. *See Crane v. State,* 786 S.W.2d 338, 349–50 (Tex. Crim. App. 1990). Once the opponent of extraneous-acts evidence raises an appropriate character-evidence objection, the proponent of the evidence must satisfy the trial court that the evidence has relevance apart from proving character conformity. *Johnston,* 145 S.W.3d at 220; *Lopez v. State,* 200 S.W.3d 246, 252 (Tex.App.-Houston [14th Dist.] 2006, pet. ref'd.); *Montgomery v. State,* 810 S.W.2d 372, 387

23

(Tex.Crim.App.1991). Hampton's prior criminal record from the State of Virginia had no logical relevance to the stabbing of Jennings. Her prior threats to Crystal did were not shown to have relevance to her stabbing Jennings. Finally, her criminal conduct after the offense was not shown to be relevant to her motive for stabbing Jennings. The State was erroneously permitted to portray Hampton as a violent criminal with a prior criminal record and a criminal in general.

Finally, the State's claim that the prior criminal record and extraneous bad acts was admissible in rebuttal of Hampton's claim of self-defense is misguided. Hampton concedes that if an extraneous offense is relevant in tending to rebut a defensive theory, it should be admissible. *Halliburton,* 528 S.W.2d 216, 219 (Tex. Crim. App. 1975); *Gomez v. State,* 626 S.W.2d 113, 115 (Tex. App.—Corpus Christi 1981, pet. ref'd). The State never made an effort to demonstrate in what manner the extraneous offenses tended to undermine Hampton's claim of self-defense. The claim of self-defense was not undermined by a showing that Hampton had vandalized automobiles, burglarized a home, threatened the mother of Jenning's children, and had a prior criminal record. The trial court abused its discretion in finding to the contrary and admitting the evidence as rebuttal to the claim of self-defense.

24

Hampton has demonstrated an abuse of discretion in the admission of the complained of evidence. The evidence was erroneously admitted and painted Hampton as a violent criminal with a prior criminal record and a criminal in general.

Error under the rules of evidence in the admission of evidence constitutes nonconstitutional error. *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998). A reviewing court is to disregard nonconstitutional error that does not affect the substantial rights of the defendant. TEX. R. APP. P. 44.2(b). A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). In *Kotteakos*, the United States Supreme Court explained:

> "[I]f one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand." 328 U.S. at 765.

The Supreme Court has defined "grave doubts" to mean "in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." *Webb v. State*, 36 S.W.3d 164, 182 (Tex. App.-

25

Houston [14th Dist.] 2000, pet. ref'd).  If the reviewing court is unsure whether the error affected the outcome, the court should treat the error as harmful, that is, as having a substantial and injurious effect or influence in determining the jury's verdict.  *Id.*

The defendant is not required to prove harm from an error.  *Johnson v. State*, 43 S.W.3d 1, 4 (Tex. Crim. App. 2001).  Indeed, there ordinarily is no way to prove "actual" harm.  *Id.*  It is instead the duty of the reviewing court to assess harm from the context of the error.  *Id.*  Thus, the proper inquiry is whether the trial court's error in allowing the State to introduce evidence of other crimes, wrongs, and acts by Hampton substantially swayed or influenced the jury's verdict, or whether this Court is left in grave doubt as to whether this extraneous offense evidence substantially swayed or influenced the jury's verdict.  *See Kotteakos*, 328 U.S. at 765; *Johnson*, 43 S.W.3d at 4.  In making that determination, this Court should consider the trial court's erroneous admission of the extraneous offense evidence in the context of the entire record and not just whether there was sufficient or overwhelming evidence of Hampton's guilt.  *See Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002).

The State urged the jury to rely on the prior threats to Crystal in order to convict Hampton of the aggravated assault of Jennings (12 RR 38).  Here, the

26

record reveals that the State spent a substantial portion of the trial proving up the other crimes, wrongs, and acts, by Hampton. While Hampton admits there is substantial evidence to support the verdict of the jury, sufficient evidence to support a conviction is only one of the factors to be considered in conducting a TEX. R. APP. P. 44.2(b) harm analysis. *Motilla*, 78 S.W.3d at 356-57.

Extraneous offense evidence can have a devastating impact on the jury's rational disposition towards other evidence because of the jury's natural inclination to infer guilt to the charged offense from the extraneous offenses. *Abdnor,* 871 S.W.2d at 738. Here, the erroneous admission of the other crimes, wrongs, and acts, was of such a magnitude that in all probability it disrupted the jury's orderly evaluation of the evidence and had a devastating impact on the jury's rational disposition towards other evidence. The natural inclination of the jury was to infer Hampton's guilt in the aggravated assault of Jennings because she was portrayed as a criminal in general due to her other criminal activity and prior criminal record.

After reviewing the entire record, this Court will be unable to find with fair assurance that the erroneous admission of other crimes, wrongs, and acts did not have a substantial and injurious effect or influence on the jury's verdict. In fact, considering the large volume of detailed inflammatory evidence presented to the jury about the extraneous criminal activities of Hampton the record reflects a

27

likelihood that the extraneous matters did have a substantial influence on the jury's verdict. This Court cannot say, with fair assurance, after considering the entire record without stripping it of the erroneous admission of the extraneous matters, that the judgment was not substantially swayed by the errors. The errors were harmful under TEX. R. APP. P. 44.2(b). Hampton should be awarded a new trial free of such errors.

### Points of Error Nine through Fifteen

**The trial court abused its discretion by overruling Hampton's TEX. R. EVID. 403 objections to the admission of extraneous offenses and bad acts (8 RR 110 and 9 RR 131).**

These points of error concern the same subject matter and the repeated abuse of discretion by the trial court. The points are directed at the trial court's denial of Hampton's TEX. R. EVID. 403 objections to the admission of extraneous offenses and bad acts. The evidence concerning those extraneous offenses and bad acts is set out above in the statement of facts.

Specifically: Hampton complaints of the admission of the burglary of Cheleste's apartment at 9 RR 9, 9 RR 63, 9 RR 96, 10 RR 25, and 10 RR 67 in point of error nine; the admission of vandalizing Crystal's car at 9 RR 10, 9 RR 110, 10 RR 25, and 10 RR 65 in point of error ten; the admission of vandalizing Jerry's car at 9 RR 12, 9 RR 114, 9 RR 131, and 9 RR 138 in point of error eleven;

28

the admission of the attempted burglary of Crystal's car at 9 RR 13, 9 RR 116, and 9 RR 139 in point of error twelve; the admission of the threat to hire someone to get Crystal before the stabbing at 9 RR 66 in point of error thirteen; the admission of a threat to beat Crystal before the stabbing at 9 RR 66 in point of error number fourteen; and the admission of stalking Crystal at 9 RR 112 and 10 RR 66 in point of error number fifteen.

Hearings were held outside the presence of the jury on the admissibility of the complained of evidence (6 RR 5 – 90, 7 RR 4 – 57, and 9 RR 119 – 131). The State claimed the complained of evidence was admissible rebut Hampton's claim of self-defense, show motive, and show intent (7 RR 55, 8 RR 109). Hampton maintained the evidence the State sought to offer was inadmissible under TEX. R. EVID. 403. The trial court overruled the objections and granted Hampton a running objection (8 RR 68, 8 RR 113, and 9 RR 131).

Even when an extraneous offense is relevant apart from its tendency to prove character conformity, before it is admissible to the jury, the court must consider whether the relevance of the evidence for other purposes is substantially outweighed by the extraneous offense's inflammatory or prejudicial potential. *Montgomery v. State*, 810 S.W.2d 372, 387 (Tex. Crim. App. 1991). The trial court overruled Hampton's objections based on TEX. R. EVID. 403 (8 RR 110 and

29

9 RR 131).  Because Hampton claimed prejudice from the admission of "other crime, wrong, or act" evidence, the trial court was called upon to weigh the probative value of such evidence against its potential for unfair prejudice, that is, its tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one. *Montgomery,* 810 S.W.2d at 389.

In order for the trial court to conduct the *Montgomery*/Rule 403 balancing test, it was called upon to consider four factors, to-wit:

> (1) how compellingly the extraneous offense evidence serves to make a fact of consequence more or less probable—a factor which is related to the strength of the evidence presented by the proponent to show the defendant in fact committed the extraneous offense;

> (2) the potential the other offense evidence has to impress the jury "in some irrational but nevertheless indelible way";

> (3) the time the proponent will need to develop the evidence, during which the jury will be distracted from consideration of the indicted offense;  [and]

> (4) the force of the proponent's need for this evidence to prove a fact of consequence, i.e., does the proponent have other probative evidence available to him to help establish this fact, and is this fact related to an issue in dispute. *Montgomery*, 810 S.W.2d at 389-90.

Hampton maintains that upon careful examination and review, this Court should find the trial court abused its discretion upon undertaking the Rule 403 balancing analysis.

## First factor—Degree of Relevance and Strength of Evidence

In this case, Hampton continues to maintain her prior bad acts and extraneous offenses were not relevant to an issue in the case. The evidence did not serve to make a fact of consequence to the aggravated assault of Jennings more or less probable. Despite the strength of the State's case, the State urged the jury to rely on the irrelevant prior threats to Crystal in order to convict Hampton of the aggravated assault of Jennings (12 RR 38). Hampton submits the admission of the evidence violated the first *Montgomery* factor.

## Second factor—Irrational, Indelible Impression

This factor focuses on the impact that "other crime, wrong, or act" evidence can and will have on the thought processes of the jurors. In this case there was a seemingly unending parade of "other crime, wrong, or act" evidence. There was "other crime, wrong, or act" evidence about a burglary, two acts of vandalism of automobiles, and attempted burglary of an automobile, threats, and stalking. Evidence of this nature would most assuredly "impress the jury in some irrational and indelible way," and the Court in *Montgomery* expressed its overriding concern

31

about such a dangerous impression. The trial court failed to recognize that this unprecedented presentation of "other crime, wrong, or act" evidence was sure to impress the jury in some "irrational" and "indelible way." Indeed, this was exactly what the Court in *Montgomery* feared, and, to be sure, the Court hoped that the trial courts in this State would take every precautionary measure to prevent such a malady.

### Third factor—Time Needed

This factor focuses on the amount of time involved in the presentation of "other crime, wrong, or act" evidence. Indeed, in this case, the amount of time was significant. The trial court was required to consider whether such "other crime, wrong, or act" evidence would take so much time that the jury would or could be "distracted from the consideration of the indicted offense." The trial court failed to do so.

The State's case was as much about "other crime, wrong, or act" evidence as it was about the indicted offense of aggravated assault. Here, the record reveals that the State spent a substantial portion of the trial proving up the other crimes, wrongs, and acts, by Hampton.

The record reflects that a substantial percentage of the trial testimony presented by the State concerned the extraneous offenses and bad acts by

32

Hampton. Because of the disproportionate amount of trial time required to present the "other crime, wrong, or act" evidence the jurors were dangerously distracted from their duty, responsibility, and oath. *See McGregor v. State*, 394 S.W.3d 90, 121-22 (Tex. App. – Houston [1st Dist.] 2012, pet. ref'd) (holding factor weighed in favor of exclusion when evidence of extraneous offense amounted to approximately thirty-three percent of trial time); *Newton v. State*, 301 S.W.3d 315, 320-21 (Tex. App.—Waco 2009, pet. ref'd) (same, twenty-seven percent); *Russell v. State*, 113 S.W.3d 530, 545-46 (Tex. App.—Fort Worth 2003, pet. ref'd) (same, thirty percent).

### Fourth factor—State's Need

Of course, the State always needs as much "other crime, wrong, or act" evidence as the court will dare admit, and, obviously, in this case, the State's need was apparently in the trial court's mind most grave. Still, the strength or weakness of the State's case does not justify the carte blanche admission—as in the case—of "other crime, wrong, or act" evidence. Here, the evidence was clear that Hampton stabbed Jennings. The admission of all the "other crime, wrong, or act" evidence in this case went far beyond the State's need to prove the indicted offense did not occur while Hampton was acting in self-defense during the course of a sexual assault by Jennings.

Hampton stood indicted for the aggravated assault of Jennings, but, during her trial there was a horde of "other crime, wrong, or act" evidence admitted by the trial court. Needless to say, this horde of "other crime, wrong, or act" evidence represented such a great portion of the State's evidence that the resulting prejudicial impact was of such a magnitude that it defied any decent standard of fairness.

Consequently, Hampton maintains she did not receive a fair and impartial trial because the jury was inundated with so much "other crime, wrong, or act" evidence that the jury was unconsciously, unwittingly, and unfairly prejudiced against her. Hampton submits the trial court abused its discretion in conducting the Rule 403 balancing test and failing to exclude the evidence of other crimes, wrongs, and acts on the basis the probative value of the evidence was substantially outweighed by the danger of unfair prejudice.

Hampton relies on the same harm analysis set forth above with regard to her first eight points of error. After reviewing the entire record, this Court will be unable to find with fair assurance that the erroneous admission of other crimes, wrongs, and acts did not have a substantial and injurious effect or influence on the jury's verdict. In fact, considering the large volume of detailed inflammatory evidence presented to the jury about the extraneous criminal activities of Hampton

34

the record reflects a likelihood that the extraneous matters did have a substantial influence on the jury's verdict. This Court cannot say, with fair assurance, after considering the entire record without stripping it of the erroneous admission of the extraneous matters, that the judgment was not substantially swayed by the errors. The errors were harmful under TEX. R. APP. P. 44.2(b). Hampton should be awarded a new trial free of such errors.

## Prayer

Hampton prays this Court will reverse the judgment of conviction and remand for a new trial or enter any other relief from the judgment as appropriate under the facts and the law.

Respectfully submitted,

/s/ Richard E. Wetzel
Richard E. Wetzel
State Bar No. 21236300
1411 West Avenue
Suite 100
Austin, TX 78701

(512) 469-7943
(512) 474-5594 – facsimile
wetzel_law@1411west.com

Attorney for Appellant
Alexandria Tammy Hampton

35

**Certificate of Compliance**

This pleading complies with TEX. R. APP. P. 9.4. According to the word count function of the computer program used to prepare the document, the brief contains 7,510 words excluding the items not to be included within the word count limit.

/s/ Richard E. Wetzel
Richard E. Wetzel
State Bar No. 21236300

**Certificate of Service**

I, Richard E. Wetzel, counsel for appellant, do hereby certify that a true and correct copy of the foregoing document was emailed to counsel for the State, Bob Odom, Assistant District Attorney, at bob.odom@co.bell.tx.us, through the efile electronic service feature of this Court's efile system on this the 29th day of December, 2014.

/s/ Richard E. Wetzel
Richard E. Wetzel
State Bar No. 21236300